**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| City of Glendale, a municipal corporation, ) | No. CV-12-380-PHX-BSB |
| Plaintiff, ) | **ORDER** |
| vs. ) | |
| National Union Fire Insurance Company ) of Pittsburgh, PA; Commerce and Industry ) Insurance Company; and Chartis ) Aerospace Adjustment Services, Inc., ) | |
| Defendants. ) | |

In this insurance coverage dispute, Plaintiff, the City of Glendale (City), alleges that Defendants, National Union Fire Insurance Company of Pittsburgh (National Union), Commerce and Industry Insurance Company (Commerce and Industry), and Chartis Aerospace Adjustment Services , Inc. (Chartis), improperly denied the City's claims for insurance coverage related to *Valley Aviation Services v. City of Glendale* (the Valley Aviation litigation).[1] (Doc. 1.) The City seeks a declaratory judgment and asserts claims for breach of contract and tortious interference of the covenant of good faith and fair dealing. (*Id.*)

Defendants have moved for summary judgment, arguing that the contracts at issue did not provide coverage for the City's claims, that they did not breach the contracts, and that they cannot be held liable in bad faith. (Doc. 24.) The City has responded to Defendants' motion

---

[1] Arizona Superior Court No. CV2009-0138582.

1  (Doc. 48), and filed a cross motion for partial summary judgment on the Defendants' duty to

2  defend and pay the City's defense cost. (Doc. 46.)  As set forth below, the Court denies

3  Defendants' motion and grants Plaintiff's motion.

4  **I. Background**

5      **A.  The Valley Aviation Litigation**

6          In the lawsuit underlying this insurance coverage dispute, Valley Aviation Services, a

7  tenant at the Glendale Municipal Airport, alleged that the City engaged in discrimination in

8  connection with Valley Aviation's lease of hangars at the airport.  On April 27, 2009, Valley

9  Aviation filed suit against the City alleging that since the early 1990s, it had "endured numerous

10  and repeated acts of discrimination . . . that [were] motivated by the City's intention to make

11  the land lease unprofitable and uneconomical so the City could take over the land and its

12  improvements."  (Doc. 25 ¶ 8, Ex. 3.)  Valley Aviation alleged that the City damaged its

13  business by denying Valley Aviation's tenants permission to engage in certain activities that

14  were allowed in other hangars at the airport.

15          Valley Aviation's original complaint sought declaratory relief, attorneys fees', and costs.

16  In a notice of claim dated May 1, 2009, Valley Aviation also asserted claims for $15 million in

17  damages in lost rent and lost business value.  (Doc. 25 ¶¶ 8, 15-16, Exs. 3 and 4.)  On February

18  17,  2010, Valley Aviation filed an amended complaint based on the same conduct alleged in

19  the original complaint, again seeking declaratory relief, but also asserting causes of action for

20  breach of contract, breach of the covenant of good faith and fair dealing, and interference with

21  business expectancy, and seeking more than $15 million in compensatory damages.  (Doc. 25

22  ¶ 20, Ex. 8.)  The amended complaint also sought an award of attorneys fees' and costs.

23          In May 2011, the Valley Aviation lawsuit was tired to a jury, which returned a verdict

24  against the City for bad faith in the amount of  $1,112,200, and for intentional interference with

25  business relations in the amount of $665,718.  (Doc. 47 ¶ 16, Ex. 4.)  The judgment included

26  an award of attorneys' fees and costs in the amount of $497,724.32.  (Doc. 47 ¶ 17, Ex. 5.)

27

28                                                        - 2 -

**B.  The Insurance Policies and the Defendants' Coverage Decisions**

The City was insured by Defendant National Union under an Aviation Commercial General Liability Policy from January 26, 2008 to January 26, 2009.  (Doc. 25 ¶ 1, Ex. 1.) When the National Union policy expired, Defendant Commerce and Industry issued a renewal policy for the period from January 26, 2009 to January 26, 2010 (collectively the Policies). (Doc. 25 ¶ 5, Ex. 2.)  The Policies provided substantially the same liability coverage for "damages" due to "personal injury." (Doc. 25, Exs. 1 and 2.)

Defendant Chartis administered claims asserted under the Policies.  (Doc. 47 ¶ 18, Ex. 6.) In October 2009, based on the coverage analysis conducted by Chartis's outside counsel, Defendants denied coverage under the Policies for Valley Aviation's claims against the City. (Doc. 47 ¶ 51; Doc. 25 ¶ 18, Ex. 6.)  In August 2011, after the trial and judgment in the Valley Aviation litigation, the City renewed its insurance claims and asked Defendants to reconsider their coverage decision.  (Doc. 25 ¶ 19, Ex. 7.)  After outside counsel conducted a coverage analysis, Defendants again denied coverage (Doc. 25 ¶ 25, Ex. 9), and in October 2011, the City filed the pending suit against Defendants.  (Doc. 1).

**II.  Summary Judgment Standard**

Federal Rule of Civil Procedure 56 authorizes the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);[2] *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at  323.  If the moving party meets its initial burden, the opposing party must establish the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  To avoid summary

---

[2]  Although Rule 56 was amended in 2010, the amendments did not alter the standard for granting summary judgment and cases applying the prior version of Rule 56 remain applicable. *See* Fed. R. Civ. P. 56 advisory committee's note (2010 amendments).

- 3 -

1  judgment, the opposing party must demonstrate the existence of a factual dispute that is both

2  material, meaning it affects the outcome of the claim under the governing law, *see Anderson v.*

3  *Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Fortune Dynamic, Inc. v. Victoria's Secret*

4  *Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, meaning "'the

5  evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

6  *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (quoting

7  *Anderson*, 477 U.S. at 248).  The opposing party "must show more than the mere existence of

8  a scintilla of evidence." *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010) (citing

9  *Anderson*, 477 U.S. at 252).  The evidence of the non-movant is "to be believed, and all

10  justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

11  **III.  Declaratory Judgment/Duty to Defend and Breach of Contract Claims**

12        Defendants argue that they are entitled to summary judgment on the City's declaratory

13  judgment and breach of contract claims because the Policies did not provide coverage for the

14  losses the City suffered in the Valley Aviation litigation.  In its cross-motion, the City argues

15  that Defendants had a duty to defend because the allegations in the Valley Aviation litigation

16  triggered coverage under two provisions of the Policies' personal injury coverage: (1) the

17  invasion of the right of private occupancy provision (the Private Occupancy Provision), and

18  (2) the discrimination provision.

19        The Policies provided insurance coverage for the City for liability for personal injury

20  claims resulting from the City's aviation operations and defined "personal injury" as "injury,

21  other than bodily injury, arising out of one or more of the following offenses":

22      (c)  the wrongful eviction from, wrongful entry into or invasion of the right of
23      private occupancy of a room dwelling or premises that a person occupies by or
    on behalf of its owner, landlord, or lessor.

24      (g) Discrimination or humiliation suffered by an individual, based on, but not
25      limited to race, color, religion, national origin, age, sex, marital status, sexual
    orientation, harassment, handicap, pregnancy, chronic medical condition, or
26      obesity.

27  (Doc. 25 ¶¶ 2-3, Ex. 1; Doc. 25 ¶ 6, Ex. 2.)

28                                   - 4 -

1    Because jurisdiction is based on diversity of citizenship, the Court applies the substantive

2    law of Arizona to resolve the insurance coverage issues.  *See Erie v. Tompkins*, 304 U.S. 64, 78

3    (1938) (federal courts sitting in diversity apply state substantive law and federal procedural

4    law).

5    **A.  The Duty to Defend Under Arizona Law**

6    Under Arizona law, an insurer has a duty to "defend the insured against any claim

7    'potentially covered by the policy.'"  *Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcon.*

8    *Ins. Co.*, 178 P.3d 485, 491 (Ariz. Ct. App. 2008) (citation omitted).  The "insurance policy

9    language controls the scope and extent of an insurer's duty to defend."  *Cal. Cas. Ins. Co. v.*

10   *State Farm Mut. Auto. Ins. Co.*, 913 P.2d 505, 508 (Ariz. Ct. App.1996).  A"duty to defend

11   arises at the earliest stages of litigation and generally exists regardless of whether the insured

12   is ultimately found liable."  *Regal Homes, Inc. v. CNA Ins.*, 171 P.3d 610, 615 (Ariz. Ct. App.

13   2007).

14   The duty to defend focuses on the facts alleged rather than the legal characterization of

15   the causes of actions alleged in the complaint against the insured.  *Kepner v. W. Fire Ins. Co.*,

16   509 P.2d 222, 224 (1973).  Thus, whether Defendants had a duty to defend the City in the

17   Valley Aviation litigation is determined by the factual allegations made by Valley Aviation.

18   *See Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 544 (Ariz. Ct. App. 2007).  Therefore,

19   the Court will consider Defendants' duty to defend by comparing the allegations in the Valley

20   Aviation litigation to the Policies.  If Valley Aviation's allegations implicate any insurance

21   coverage under the Policies, then Defendants owed a duty to defend.  *See id*.; *see also W. Cas.*

22   *& Sur. Co. v. Int'l Spas of Ariz., Inc*., 634 P.2d 3, 7 (Ariz. Ct. App. 1981).  Generally, the

23   insured bears the burden of establishing coverage under an insuring clause.  *Keggi v.*

24   *Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000).

25   Here, the essential factual allegations in the Valley Aviation litigation were that the City,

26   as landlord, improperly interfered with and discriminated against a tenant, Valley Aviation, that

27   was trying to lease out its private hangar space at the Glendale Airport. (Doc. 25 ¶¶ 8-11, Exs. 3

28

- 5 -

and 8.)  Valley Aviation alleged that the City "discriminated against [it] in favor of other tenants: [the City is] attempting to run Valley Aviation out of business." (Doc. 25, Ex. 8 ¶ 20.) Valley Aviation alleged that the City "refus[ed] to provide Valley Aviation with permission to run its business [in the same manner as] other tenants at its airport," and "interfered with [its] ability to attract or keep prospective tenants." (*Id*.)  The amended complaint asserted a claim of "intentional interference with business expectancy" based on the City's alleged intentional interference "with Valley Aviation's ability to attract or keep prospective tenants." (Doc. 25, Ex. 8 ¶¶ 24-26.)  The original complaint, the notice of claim, and the amended complaint alleged damages based on lost rent, interest, and lost value of business. (Doc. 25, Exs. 3, 4 and 8. )  The issue before the Court is whether the facts alleged in the Valley Aviation litigation fit within the Policies' personal injury coverage.

### B. Arizona Law Regarding Contract Interpretation

The interpretation of an insurance contract is an issue of law for the court to decide. *Thomas v. Liberty Mut. Ins. Co.*, 842 P.2d 1335, 1337 (Ariz. Ct. App. 1992); *McHugh v. United States Auto Ass'n.*, 164 F.3d 451 (9th Cir. 1999).  Under Arizona law, courts interpreting insurance policies "apply the language according to its plain and ordinary meaning from the standpoint of an individual untrained in law or business." *Nucor Corp. v. Emp'rs Ins. Co. of Wausau*, 2012 WL 5893485, *2 (Ariz. Ct. App. Nov. 23, 2012) (citing *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421, 427 (Ariz. Ct. App. 2010)).  An insurance policy "must be read as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions." *Nichols v. State Farm Fire & Cas*., 857 P.2d 406, 408 (Ariz. Ct. App. 1993).  Unambiguous provisions must be given effect as written. *Benevides v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 911 P.2d 616, 619 (Ariz. 1995).

An insurance policy is ambiguous if there is more than one reasonable interpretation of its terms. *Desert Mountain*, 236 P.3d at 427.  Arizona courts may consider extrinsic evidence to identify and resolve ambiguities in an insurance policy. *Lennar Corp. v. Transamerica Ins., Co*., 256 P.3d 635, 641 (Ariz. Ct. App. 2010).  However, "neither language nor apparent

ambiguity alone is dispositive." *State Farm Mut. Auto Ins. Co. v. Wilson*, 782 F.2d 727, 733 (Ariz. 1989). "If a clause appears ambiguous, [the court] interpret[s] it by looking to legislative goals, social policy, and the transaction as a whole. If an ambiguity remains after considering these factors, [the court] construe[s] it against the insurer." *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008) (citations omitted); *see also Wilshire Ins. Co. v. S.A.*, 227 P.3d 504, 506 (Ariz. Ct. App. 2010) ("We construe the clause against the insurer, however, if ambiguity remains after we apply those interpretive guides.") Accordingly, the central issue here is whether the Policies' language in the Private Occupancy Provision or the discrimination provision is ambiguous. The Court will first consider whether there was coverage under the Private Occupancy Provision.

### C. The Private Occupancy Provision

Defendants argue that the City has not established that it was entitled to coverage for the Valley Aviation litigation under the Private Occupancy Provision of the Policies. (Doc. 24 at 9.) Defendants assert that in the underlying litigation Valley Aviation alleged a "pattern of economic discrimination that caused it economic harm" and that under the "unambiguous terms of the policy, this economic harm did not constitute an invasion of the right of private occupancy." (*Id*. at 10.) Defendants argue that an "invasion of the right of private occupancy" requires a "physical invasion to real property." (*Id.* at 11.)

In contrast, the City argues that the phrase "invasion of the right of private occupancy" is not limited to physical invasions or intrusions onto property, but also includes "an illegal violation or encroachment on a tenant's right to use or enjoy private property." (Doc. 48 at 2.) Alternatively, the City argues that the phrase "invasion of the right of private occupancy" is "at minimum, ambiguous" and must be construed in its favor and against the Defendants, as insurers. (Doc. 46 at 12; Doc. 48 at 5-6.).

The City argues that the Court should construe this provision by applying the plain and ordinary meaning of the words; Defendants argue that the Court should apply the doctrine of *ejusdem generis*; and both the City and Defendants argue that decisions from other courts

- 7 -

1  construing the provision support their positions.  The Court will address each of these proposed
2  methods of construction.

3  **1. Plain and Ordinary Meaning**

4  The phrase "invasion of the right of private occupancy" is not defined in the Policies and
5  has not been interpreted by the Arizona courts.  Thus, under Arizona law, the Court must give
6  that phrase its plain and ordinary meaning and may refer to dictionary definitions to determine
7  that meaning.  *See Desert Mountain*, 236 P.3d at 429 (stating that Arizona courts interpret an
8  insurance policy according to its plain and ordinary meaning, from the point of view of an
9  individual untrained in the law and consulting dictionary for definition of damages).

10  The City argues that the plain and ordinary meaning of the words in the phrase "invasion
11  of the right of private occupancy," as determined by the dictionary definitions of those words,
12  establishes that "none of the foregoing definitions requires a physical intrusion onto property
13  as argued by [D]efendants."  (Doc. 48 at 2.)  Thus, the City argues that applying these
14  definitions, the ordinary meaning an average person would apply to this phrase "would include
15  an illegal violation or encroachment upon a tenants's right to use or enjoy property." (*Id.*)

16  A review of the dictionary definitions of the words in the phrase "invasion of the right
17  of private occupancy" reveals that the word "invade" is defined as "to enter for conquest or
18  plunder," "to encroach upon: infringe," "to spread over or into as if invading: permeate," and
19  "to affect injuriously and progressively."  *See* Merriam-Webster Online, http://www.merriam-
20  webster.com/dictionary (last visited Mar. 28, 2013).  A "right" is "that which is legal, morally
21  good, or appropriate."  *Id.*  "Private" is defined as "intended for or restricted to the use of a
22  particular person, group, or class,"and "belonging to or concerning an individual person,
23  company, or interest."  *Id.*  "Occupancy" is defined as "the fact or condition of holding,
24  possessing, or residing in or on something," "the act or fact of taking or having possession,"
25  "the use to which a property is put," and "a building or part of a building intended to be
26  occupied (as by a tenant)." *Id.*

27

28

1     Thus, contrary to the City's assertion, the definition of "invade" includes "to enter,'

2   which implies a physical intrusion.  However, the definition of invade also includes terms that

3   do not appear to require a physical intrusion, including "to encroach upon," infringe," or "affect

4   injuriously."  The words in the phrase "invasion of the right of private occupancy" can have

5   several meanings.  Thus, the phrase appears ambiguous when you apply the plain and ordinary

6   meaning of the words, as defined in the dictionary.

7     Additionally, Chartis's Senior Vice President and Rule 30(b)(6) witness, Betsy Fulton,

8   could not define the phrase or give examples of a covered invasion of the right of private

9   occupancy. (Doc. 47 ¶¶ 66-67, Ex. 6.)  Defendants argue that this testimony does not establish

10  the parties' intent or understanding of the Policies at the time they were entered.  (Doc. 55 at

11  15-16.)  Nonetheless, this testimony does support the City's argument that an average purchaser

12  of insurance would not understand the Private Occupancy Provision. *See American Guar. and*

13  *Liab. Ins. Co. v. 1906 Co.*, 273 F.3d 605, 619 (5th Cir. 2001) (holding that, based on dictionary

14  definitions, the "average purchaser of insurance" could understand the phrase "invasion of the

15  right of private occupancy" to include invasion by hidden camera and alternatively finding that

16  the phrase is ambiguous).

17    Defendants do not support their construction of the Private Occupancy Provision by

18  arguing the plain and ordinary meaning or dictionary definitions of the words of the provision.

19  Defendants argue that the Policies "cannot be interpreted by looking at the dictionary definitions

20  in a vacuum," but that the words must be considered in context of the Policies. (Doc. 54 at 1-5).

21  Although Defendants are correct that the words in the Private Occupancy Provision must be

22  considered in context, they do not provide any explanation of how the context of that provision,

23  or the Policies as a whole, define the words in the phrase "invasion of the right of private

24  occupancy."

25    Defendants also do not offer any analysis of the words of the provision.  Instead, they

26  restate their argument that this provision did not trigger any insurance coverage for the City

27  because Valley Aviation alleged a pattern of economic discrimination, and not a physical

28                    - 9 -

1  invasion of property rights.  (Doc. 54 at 2-3.)  Defendants cite cases from other jurisdictions that

2  are not applying Arizona law to again argue that an "invasion of the right of private occupancy"

3  requires a physical invasion of property rights.  (*Id*.)  These arguments and citations are not

4  helpful in construing the plain and ordinary meaning of the provision at issue, as Arizona law

5  requires.  *See Desert Mountain*, 236 at 429.  Therefore, the plain and ordinary meaning of the

6  words of the Private Occupancy Provision supports the conclusion that this provision is

7  ambiguous.

8  **2.  The *Ejusdem Generis* Doctrine**

9  Defendants argue that under the doctrine of *ejusdem generis* the phrase "invasion of the

10  right of private occupancy" must be construed to require a "physical invasion to real property."

11  (Doc. 24 at 10-11; Doc. 54 at 7-8; Doc. 55 at 4-5.)  Under that doctrine, a general term that

12  follows an enumeration of specific terms should be construed as applying only to things of the

13  same general class as those specifically mentioned.  *See Keggi*, 13 P.3d at 789-90 (a more

14  general phrase should be interpreted in accordance with the prior specific terms).  However,

15  "[i]f the specific words exhaust the class, the general words must extend beyond the class or

16  have no meaning."  *State v. Edwards,* 446 P.2d 1, 3 (Ariz. 1968).  And "[i]f the specific words

17  do not denote the same class, *ejusdem generis* cannot apply. *City of Phoenix v. Yates*, 208 P.2d

18  1147, 1150 (Ariz. 1949)).

19  Defendants argue that because the phrase "invasion of the right of private occupancy"

20  follows the phrases "wrongful entry" and "wrongful eviction" in the listing of offenses giving

21  rise to covered personal injury liability, under the doctrine of *ejusdem generis,* the Court must

22  construe the more general phrase, "right of private occupancy," in accordance with the prior

23  specific terms, "wrongful entry" and "wrongful eviction."  (*Id.*)  Defendants argue that the

24  "invasion of the right of private occupancy" is limited to offenses similar to "wrongful eviction"

25  or "wrongful entry," which it argues require "a physical invasion such as trespass."  (Doc. 24

26  at 11.)  Therefore, under Defendants' argument, the key to interpreting the phrase "invasion of

27

28

the right of private occupancy" lies in the definition of "wrongful entry" and "wrongful eviction" under Arizona law.

Defendants, however, do not discuss the definitions of "wrongful entry" or "wrongful eviction" under Arizona law or explain their conclusion that the Private Occupancy Provision is only triggered by a "physical invasion." (Doc. 24 at 10-11, Doc. 54 at 8-9.) The City argues that the doctrine of *ejusdem generis* does not support Defendants' position because Arizona law does not require a physical invasion of property to establish wrongful eviction, but instead recognizes constructive eviction. *See Purvis v. Silva*, 381 P.2d 596, 597 n.2 (Ariz. 1963) (defining wrongful eviction to include constructive eviction through "substantial and intentional interference by the lessor with the tenant's permanent use and occupancy of the premise" and finding such eviction was accomplished by the landlord turning off the water to premises where tenant operated a laundry business).

The Court finds that Defendants' arguments relying on the *ejusdem generis* doctrine are not helpful in construing this provision of the Policies because Defendants have not established how the terms "wrongful entry" or "wrongful eviction" would define or limit the phrase "invasion of the right of private occupancy," and have not addressed whether the more specific terms "exhaust the class" or are of the same class as the more general term. Furthermore, Defendants have not identified any claims that would be covered under the right of private occupancy that would not qualify as a wrongful entry or eviction. Thus, their argument appears to render the Private Occupancy Provision meaningless and superfluous. This result would be contrary to Arizona law, which requires that an insurance contract be construed to give effect to all of its provisions. *See Nichols*, 857 P.2d at 408.

Defendants cite three cases from other jurisdictions to support their application of the *ejusdem generis* doctrine to limit the Private Occupancy Provision. (Doc. 24 at 11.) Each of these cases, however, applies laws from other states to insurance contracts that contain a private occupancy provision that differs from the language at issue here. In each of those cases, the courts applied the *ejusdem generis* doctrine to policy provisions that provided liability coverage

- 11 -

for "wrongful entry or eviction or *other* invasion of the right of private occupancy." *Id.* (*citing Sterling Builders Inc. v. United Nat'l Ins. Co.*, 79 Cal. App. 4th 105, 108-09 (2000) (California law); *Liberty Mut. Ins. Co. v. E. Cent. Okl. Elec. Coop.*, 97 F.3d 383, 390 (10th Cir. 1996) (Oklahoma law); *Red Ball Leasing, Inc. v. Hartfort Acc. & Indem. Co.*, 915 F.2d 306, 312 (7th Cir. 1990) (Indiana law) (emphasis added to the word "other")).

In this case, the provision at issue does not include the word "other" before the phrase "invasion of the right of private occupancy." (Doc. 25, Ex. 1 at 18, Ex. 2 at 22.)  This is a "critical distinction" because "use of the term 'other' to connect the phrase 'invasion of the right of private occupancy' to the wording that precedes it satisfied [the court] that the parties intended that such invasion also be limited . . . ." *New Castle Cnty. v. Nat'l Union Fire. Ins. Co.*, 243 F.3d 744, 752 (3d Cir. 2001) (quoting *Groshong v. Mut. of Enumclaw Ins. Co.*, 985 P.2d 1284 (Or. 1999)).[3]  Given this distinction between the wording of the private occupancy provision in the cases Defendants cite and the wording of the Private Occupancy Provision in the Policies at issue here, the Court finds that the *ejusdem generis* doctrine does not help clarify the parties' intentions.  Therefore, the Court finds the *ejusdem generis* doctrine unhelpful to determining the scope of coverage under the Private Occupancy Provision in this case.

### 3.  Decisions of Other Courts

The parties have not cited a decision of an Arizona court, or of a federal court applying Arizona law, interpreting the scope of coverage under the phrase "invasion of the right of

---

[3]  In a footnote, Defendants argue that *New Castle* is distinguishable because the Third Circuit "refused to apply the doctrine of *ejusdem generis,*" which they assert would violate Arizona law.  (Doc. 24 at 11 n.3.)  The Court finds that this argument does not address the analysis set forth in *New Castle* and thus provides no basis to distinguish that case.  Defendants also argue that *New Castle* is distinguishable because it involved claims against the insured alleged by a natural person, not an organization like Valley Aviation.  This distinction also fails because it does not address whether, regardless of the identity of the underlying plaintiff, the Private Occupancy Provision is limited only to claims asserting a physical invasion of property, as Defendants have argued.  Defendants argument is addressed more fully below in section III(D).

1   private occupancy." The Court also has not identified a case applying Arizona law to construe

2   this phrase. Both the City and Defendants rely upon numerous cases from other jurisdictions

3   to support their arguments regarding the construction of this phrase. As set forth below, after

4   reviewing decisions of other jurisdictions, the Court finds that the phrase "invasion of the right

5   of private occupancy" is ambiguous regarding whether that phrase requires a physical invasion

6   of real property, or whether it includes interference with rights relating to property, such as the

7   ability to lease property as alleged in the Valley Aviation litigation.

8       The Third Circuit construed the scope of insurance coverage for an "invasion of the right

9   of private occupancy" under Delaware law in *New Castle,* 243 F.3d 744. The court explained

10  that this "phrase is widely used in insurance policies and has been the subject of heated

11  litigation throughout the entire country over the past thirty years." *Id.* at 747. The court

12  rejected the argument that it should apply the doctrine of *ejusdem generis* to narrowly construe

13  this phrase and instead held that the phrase was ambiguous and should be construed in favor of

14  the insured. *Id.*

15      In litigation underlying the *New Castle* decision, the insured, New Castle County, a

16  political subdivision, had repeatedly frustrated a real estate developer's plans to develop certain

17  tracts of property by denying the requisite building permits, voiding a development plan, and

18  rezoning one of the properties. The underlying claimant did not allege a physical invasion of

19  his real property, but instead alleged that New Castle County was "arbitrarily treating him

20  differently than other developers." *Id.* at 747. The court comprehensively reviewed the

21  divergent case law regarding the meaning of the phrase "invasion of the right of private

22  occupancy" and concluded that it is ambiguous as a matter of law:

23          A single phrase, which insurance companies have consistently refused to define,
            and that has generated literally hundreds of lawsuits, with widely varying results,
24          cannot, under our application of commonsense, be termed unambiguous.
    *Id.* at 756 (citations omitted).
25

26      The Third Circuit noted that even the courts that found the phrase unambiguous applied

27  different lines of reasoning: some courts applied the doctrine of *ejusdem generis* to limit the

28                                                   - 13 -

1   right of private occupancy to offenses similar to eviction or wrongful entry and required a

2   violation of the claimant's possessory interest in real property; some courts found that the

3   invasion of the right of private occupancy only applied in a landlord-tenant context; and some

4   courts found that an invasion of the right of private occupancy required a physical invasion. *Id.*

5   at 750-53 (collecting and summarizing cases).

6          The Third Circuit also explained that a "smaller, but not insignificant, number of

7   decisions" have construed the right of private occupancy more broadly and found that this

8   provision protects the use and enjoyment of property, without a physical invasion. *Id* at 753-54

9   (collecting and summarizing cases). Thus, "some courts have held that the language at issue

10  is ambiguous simply because of the wide variance among judicial opinions," other courts

11  applied a "narrow, fact-specific analysis," and "some courts have held that an 'invasion of the

12  right of private occupancy' is ambiguous as a matter of law." *Id.*

13         The Third Circuit's decision in *New Castle* is persuasive. As that court found, the

14  decisions interpreting the phrase "invasion of the right of private occupancy" vary widely.

15  Some courts have held that claims that do not involve the physical occupation of or trespass

16  upon real property are not covered under this provision, even though the claims involve

17  interference with rights relating to such property.[4]   Several other courts have rejected

18  _____

19        [4]  *See Rosenberg Diamond Dev. Corp. v. Wausau Ins. Co.*, 326 F. Supp. 2d 472, 478
20  (S.D.N.Y. 2004), *aff'd*, 144 Fed. Appx. 122 (2d Cir. 2005) (prospective tenants' claims of racial
    discrimination were not covered as wrongful entry, wrongful eviction, or invasion of the right
21  of private occupancy because claimants were not denied an existing right of occupancy)*;
    Sterling Builders,* 93 Cal. Rptr. 2d at 699 (claim that insured lied about its intentions to perform
22  certain acts in exchange for claimants' granting the insured an easement over their property was
    not covered under a clause covering "other invasion of the private right of occupancy" because
23  the damages were caused by "a transaction not a trespass"); *Columbia Nat. Ins. v. Pacesetter
    Homes, Inc.*, 532 N.W.2d 1, 9 (Neb. 1995) ("other invasion of the right of private occupancy"
24  did not include invasion from noise, dust, lighting or other construction activities near lots
    developer sold because purchasers did not claim physical invasion of their lots; the "right of
25  private occupancy is the legal right to occupy premises, not the right to enjoy occupying those
26  premises"); *Titan Corp. v. Aetna Cas. & Sur. Co.*, 27 Cal. Rptr. 2d 457, 486-87 (Cal. Ct. App.
27  1994) (the term "'other invasion of the right of private occupancy' draws meaning and content

28                                              - 14 -

Defendants' assertion that coverage for an invasion of the right of private occupancy requires a physical invasion of property, or have found the phrase ambiguous and found coverage under differing circumstances that did not include a physical invasion.[5]

_____

from the preceding language: 'wrongful entry or eviction'" and "connotes disruptions of the ability of a landowner to actually occupy his property, not mere injuries to the property" caused by groundwater contamination); *Cnty. of Columbia v. Cont'l Ins. Co.*, 595 N.Y.S.2d 988, 991 (N.Y. App. Div.1993) (claims for trespass and nuisance action based on environmental damage to real property caused by "leachate contamination" from a landfill did not constitute a "wrongful entry or eviction or other invasion of the right of private occupancy").

[5] *See Titan Holdings Syndicate, Inc. v. City of Keene*, 898 F.2d 265, 273 (1st Cir. 1990) (homeowners' claims alleging that odors, noise and light from insured's sewage treatment plant interfered with use of their were property covered under private occupancy provision because the "ordinary meaning" of the clause other invasion of the right of private occupancy "does not require a physical invasion" of property, and substantial interference with the enjoyment of property is sufficient to trigger coverage); *see also Sell v. Nationwide Mut. Ins. Co.,* 2012 WL 3298393 (9th Cir. Aug. 14, 2012) (applying California law and finding phrase "invasion of the right of private occupancy" was ambiguous as to whether it required physical possession of the property at issue); *American Guar. and Liab. Ins. Co.*, 273 F.3d 605, 619 (5th Cir. 2001) (plain meaning of "invasion of the right of private occupancy" included coverage for invasion of dressing rooms by a hidden camera, or alternatively finding the phrase ambiguous and construing it in favor of the insured*); Lakeland Village Homeowners Assoc. v. Great Am. Ins. Group*, 727 F. Supp. 2d 887, 893 (E.D. Cal. 2010) (because the phrase "other invasion of the right of private occupancy" was subject to more than one reasonable interpretation, it is ambiguous and must be construed in favor of the insured); *Pellegrino Food Prods. Co., Inc. v. Am. Auto. Ins. Co.*, 655 F. Supp. 2d 569, 579 (W.D. Pa. 2008) (phrase "invasion of private occupancy" is ambiguous as to whether it encompassed insured city's alleged "discriminatory pattern of conduct with regard to zoning decisions, property sales, and other matters"); *Hobbs Realty & Const. Co. v. Scottsdale Ins. Co.*, 593 S.E.2d 103, 108 (N.C. Ct. App. 2004) (because the phrase "invasion of the right of private occupancy" is subject to more than one reasonable interpretation, it is ambiguous and must be resolved in favor of providing coverage); *Gould Inc. v. Arkwright Mut. Ins. Co.*, 829 F. Supp. 722, 729 (M.D. Pa. 1993) (personal injury endorsement for the "other invasion of the right of private occupancy" was ambiguous in the context of the policy); *Hirschberg v. Lumbermens Mut. Cas.*, 798 F. Supp. 600, 604 (N.D. Cal. 1992) (at a minimum, the phrase "invasion of the right of private occupancy," is ambiguous); *Beltway Mgmt. Co. v. Lexington–Landmark Ins. Co.*, 746 F. Supp. 1145, 1150 (D.D.C.190) ("the phrase 'other invasion of the right of private occupancy' is ambiguous," and rights of private occupancy not limited to possessory rights but include "rights to use the premises," and encompass liability for a breach of the implied warranty of habitability of an apartment); *Town*

1    A review of the case law establishes that the phrase "invasion of the right of private

2  occupancy" is subject to more than one reasonable interpretation and supports a finding of

3  ambiguity.  "Arizona follows the principle of construction that, where various jurisdictions

4  reach different conclusions as to the meaning, intent, and effect of the language of an insurance

5  contract, a strong indication of ambiguity is established."  *Fire Ins. Exch. v. Berray*, 694 P.2d

6  259, 263 (Ariz. Ct. App. 1983), *as modified on other grounds*, 694 P.2d 191 (1984) (finding

7  term "intentional acts" ambiguous based on courts' differing interpretations)*; see also Sell,* 2012

8  WL 3298393, *1(applying California law and finding phrase "invasion of the right of private

9  occupancy" ambiguous as to whether it required physical possession of the property at issue);

10  *Nucor*, 2012 WL 5893485, at *6 (finding term "suits" ambiguous based on conflicting court

11  decisions).

12    Defendants argue that this principle of construction only applies "when different

13  jurisdictions have reached different conclusions *on similar issues*."  (Doc. 69 at 2 (emphasis in

14  original)).  Defendants assert that "*no* other court has *ever* held that the type of economic

15  discrimination alleged by Valley Aviation constitutes an invasion of the right to private

16  occupancy" and therefore this principle of construction does not apply in this case.  (*Id.*

17  (emphasis in original)).

18    Defendants' argument disregards the cases in which the underlying claimants alleged that

19  the insureds substantially interfered with the use of property and the courts found coverage

20  under the right of private occupancy provisions of the insurance contracts at issue.  *See New*

21  *Castle,* 243 F.3d at 747 (underlying claimant's allegations that discriminatory zoning and

22  permitting decisions caused economic damage covered under liberal construction of private

23  occupancy provision); *Pellegrino*, 655 F. Supp. 2d at 579 (construing private occupancy

24  

25  *of Goshen v. Grange Mut. Ins. Co.*, 424 A.2d 822, 825 (N.H.1980) (claims alleging that a
26  planning board created economic hardships that destroyed the viability of the property owner's
27  project fell within the policy's coverage for "other invasion of the right of private occupancy").

28    - 16 -

provision to provide coverage for claimant's allegations of insured city's "discriminatory pattern of conduct with regard to zoning decisions, property sales, and other matters"); *Town of Goshen*, 424 A.2d at 824 (finding insured's policy provided coverage for claims alleging that a planning board created economic hardships that destroyed the viability of the property owner's project). Furthermore, Defendants' attempts to avoid this principle of construction fail because the Court finds that the issues raised in the cases from other jurisdictions considering coverage under private occupancy provisions in insurance contracts are sufficiently similar to the issues raised in this case to support a finding of ambiguity.

Finally, Defendants argue that cases in which courts have rejected a narrow interpretation of the phrase "invasion of the right of private occupancy" are distinguishable because: (1) these cases involve claims brought by natural "persons" and not by organizations or entities like Valley Aviation; and (2) these cases involve allegations that the insured "deprived the [underlying] plaintiffs of their real property interests" and that "the insured actually invaded the underlying plaintiff's possessory property rights" (Doc. 55 at 8-9). Defendants arguments are unavailing for two reasons.

First, the identity of the claimant is a separate issue from the scope of the insurance coverage under the Private Occupancy Provision. Even if the Court were to conclude that a claim under this provision must be brought by a natural person, rather than an entity, that would not determine the nature of the covered claim. Specifically, that conclusion would not determine whether a covered claimant must allege a physical invasion of property to trigger coverage under the Private Occupancy Provision.

Second, it is not clear from Defendants' argument whether they are drawing a distinction between "a physical invasion of property" and "a deprivation of real property interests" or "an invasion of possessory property rights." It appears, however, that Defendants may be suggesting a broader interpretation of the phrase "invasion of the right of private occupancy," which would include a non-physical invasion of possessory property rights. In the underlying case at issue here, Valley Aviation alleged that the City engaged in a pattern of discrimination

- 17 -

1   that was intended to favor other tenants and "run Valley Aviation out of business."  (Doc. 25,

2   Ex. 8 ¶ 20.)  Valley Aviation further alleged that the City "interfered with Valley Aviation's

3   ability to attract or keep prospective tenants."  (Doc. 25, Ex. 8 ¶ 25.)

4        Thus, Valley Aviation alleged that the City interfered with its possessory rights as a

5   tenant by improperly impeding its ability to lease hangars, and that the City attempted to

6   constructively evict Valley Aviation from its leasehold at the Glendale Municipal Airport by

7   making it difficult or impossible for Valley Aviation to operate its business there.  These are

8   allegations that the insured, the City, invaded Valley Aviation's possessory property rights as

9   a tenant at the airport.  Therefore, these claims would fall within the broader interpretation of

10  an invasion of the right of private occupancy that it appears Defendants may be advancing in

11  their attempt to harmonize divergent case law with their coverage position.

### 4.  Legislative Goals, Social Policy, and the Transaction as a Whole

13       Finding that the Private Occupancy Provision of the Policies is ambiguous does not end

14  the Court's inquiry or analysis.  Instead, "a decision to require coverage follows after

15  consideration of 'legislative goals, social policy, and examination of the transaction as a

16  whole.'" *Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc*., 183 P.3d 513, 515 (Ariz. 2008) (citing

17  *State Farm*, 782 P.2d at 734).

18       The parties have not argued that any "legislative goals" apply to the interpretation of the

19  Policies and the Court finds this interpretative guide is not implicated here. Social policy,

20  however, is implicated and in general weighs against permitting Defendants to rely on

21  undefined language in the Policies to deny coverage. *See Bjornstad v. Senior Am. Life Ins. Co.*,

22  599 F. Supp. 2d 1165, 1172 (D. Ariz. 2009) ("When the drafter [of an insurance] contract leaves

23  an important term undefined, public policy deems that the consequences of the imprecise

24  drafting should fall on the party that drafted the contract, was able to dictate the terms, has

25  experience in the insurance field, and (almost always) has at its disposal a battery of personnel

26  to serve its interests.")  Defendants have not argued that any social policy considerations

27  support construing the Policies to deny coverage.

28

1    Finally, an examination of the "transaction as a whole" is of limited use in interpreting

2  the Policies.  The parties have not cited any evidence of their intent regarding the meaning of

3  this phrase in the Policies.  The City, however, argues that because the general liability policies

4  at issue are based on standard insurance industry form language (Doc. 47 ¶ 65, Ex. 7), the Court

5  should consider the drafting intent associated with this standard industry form language.

6  (Doc. 48 at 3-4.)  The City argues that this intent can be determined from industry publications

7  and submits *The Fire Casualty & Surety Bulletin*, (The National Underwriter Co., Jan. 2005).

8    This edition of *The FC&S Bulletin* explains that the definition of "personal injury" in the

9  1973 version of the general liability policy included the "offense of the invasion of the right of

10 private occupancy," but that this phrase was deleted from the definition of "personal injury" in

11 the 1986 CGL (Commerical General Liability) coverage forms.  (Doc. 48, Ex. A.)  The *FC&S*

12 *Bulletin* explains that:

> the current CGL forms, by returning 'invasion of the right of
> private occupancy' to the meaning of personal injury have not just
> included another category in the definition; the forms have created
> a potential problem area for insurers.  As usual, the problem area
> has to do with judicial interpretations of a phrase found in an
> insurance coverage form.

16 (*Id.*)

17   Defendants do not dispute that this 2005 edition of the *FC&S Bulletin* described the

18 standard industry form language that was used in the Policies.  Instead, Defendants argue that

19 the *FC&S Bulletin* is describing a problem with judicial interpretations, not a problem with the

20 policy language.  (Doc. 54 at 5, n.1.)  While this discussion in the *FC&S Bulletin* is not directly

21 relevant to the parties' intent in entering the Policies, it is helpful in considering "the transaction

22 as a whole" because it demonstrates that before Defendants entered these contracts, insurance

23 industry publications recognized "a potential problem" with the interpretation of the phrase

24 "invasion of the right of private occupancy" in the standard form language.  Thus, Defendants

25 were or should have been aware that this provision could be considered ambiguous.

26   After considering legislative goals, social policy, and the transaction as a whole, the

27 Court resolves the ambiguity in favor of the City and finds that the claims asserted in the Valley

28

1  Aviation litigation alleged offenses that triggered coverage under the Private Occupancy
2  Provision of the Policies.

3  **D. Whether Coverage is Limited to a Natural Person**

4  Defendants further argue that even if the Valley Aviation litigation alleged conduct that
5  could constitute an invasion of the right of private occupancy, there would still be no coverage
6  because the Policies only apply if the alleged invasion is suffered by a natural person, not an
7  organization or business entity such as Valley Aviation. (Doc. 24 at 11.) Defendants argue that
8  the Policies distinguish between offenses that affect "a person," offenses that affect "a person
9  or organization," offenses that affect an "individual," and offenses that do not refer to a person,
10  organization or individual. (*Id.* at 12.) Therefore, Defendants assert that to give effect to these
11  distinctions, the Court must construe the word "person" in the Private Occupancy Provision of
12  the Policies to refer only to a natural person.[6] (*Id.*)

13  Defendants rely upon two California state court decisions for the proposition that because
14  the Private Occupancy Provision only refers to "person," while other provisions of the personal
15  injury definition refer to persons or "persons and organizations," the private occupancy
16  provision is only triggered if the underlying claim involves a natural person. *See Golden Eagle*
17  *Ins. Corp. v. Cen-Fed., Inc*., 56 Cal. Rptr. 3d 279, 288 (Cal. Ct. App. 2007) (concluding that
18  because private occupancy provision only referred to "person," while other provisions within
19  definition of personal injury referred to "a person or and organization," or did not differentiate,
20  the private occupancy provision did not apply to a corporate entity); *Mirpad, LLC v. California*
21  *Ins. Guar. Assn.*, 34 Cal. Rptr. 3d 136, 146 (Cal. Ct. App. 2005) (same).

22  The City argues that because the Policies do not define the term "person," the Court must
23  apply the plain and ordinary meaning of the word "person" to construe the Private Occupancy
24  Provision. (Doc. 48 at 10.) The City relies upon the Seventh Circuit decision in *Supreme*

25  ---

26  [6] The Private Occupancy Provision, applies to the "invasion of the right of private
27  occupancy of a room or dwelling or premises that *a person occupies* by or on behalf of its
   owner, landlord or lessor." (Doc. 25, Ex. 1 at 18; Doc. 25, Ex. 2 at 22.) (emphasis added.)

28  - 20 -

1   *Laundry Serv. L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743 (7th Cir. 2008), which rejected

2   Defendants' argument and the position of the California court in *Mirpad*.  The Seventh Circuit

3   found that the undefined term "person" in the "personal and advertising injury" section of a

4   commercial general liability insurance policy, which covered claims for wrongful eviction from

5   or wrongful entry into premises occupied by "persons," was ambiguous as to whether the policy

6   covered claims by both natural persons and entities.  *Id*. at 747.  The court concluded that, under

7   Illinois law, when the term person is not defined by the policy, it should be given its plain,

8   ordinary, and popular meaning derived from dictionary definitions.  *Id*.  The court noted that

9   the ordinary meaning of "person" as found in Webster's Dictionary, the Oxford English

10  Dictionary, and Black's Law Dictionary includes a partnership, corporation or entity.  *Id*.  Thus,

11  because the policy at issue did not define "person" or "organization," the court declined to

12  construe the word "person" to refer only to natural persons "when it can plausibly apply to a

13  corporate entity, especially where the drafters never expressed any intent that usage of the term

14  was meant only to refer to natural persons."  *Id*. at 748.

15       The Seventh Circuit's decision in *Supreme Laundry* is persuasive.[7]  As in that case, the

16  Policies at issue here do not define the terms person or organization.  As previously discussed,

17  Arizona courts consult dictionary definitions to determine the plain and ordinary meaning of

18  undefined terms.  *See Strojnik v. General Ins. Co. of Am.*, 36 P.3d 1200, 1205(Ariz. Ct. App.

19  2001).  The word "person" is defined in the dictionary as "human, individual" and as  "one (as

20  a human being, a partnership, or a corporation) that is recognized by law as the subject of rights

21  and duties."  *See* Merriam-Webster Online, http://www.merriam-webster.com/dictionary (last

22  visited Mar. 28, 2013).  Thus, because the term "person" can apply to both a natural person and

23  a business, it should not be limited to natural persons.

---

25       [7]  Other courts have rejected Defendants' arguments in the context of personal injury

26  coverage for the invasion of a "person's right to privacy."  *See Park Univ. Enter. Inc. v. Am.*

27  *Cas. Co.*, 442 F.3d 1239, 1247 n. 4 (10th Cir. 2006) (collecting cases permitting personal injury
    coverage for invasion of privacy claims brought by corporations).

28                                               - 21 -

1    Alternatively, as the City argues, because the term "person" has differing meanings that

2  are not defined in the Policies, it is ambiguous.  Because this term appears ambiguous, the Court

3  must interpret it "by looking to legislative goals, social policy, and the transaction as a whole."

4  *First Am. Title Ins.*, 187 P.3d at 1110.  The City argues that a broad interpretation of "person"

5  is consistent with legislative goals and public policy because the definition of person for

6  purposes of the Arizona Insurance Code includes business entities.  *See* Ariz .Rev. Stat. § 20-

7  105 ("'Person' includes an individual, company, insurer, association, organization, society,

8  reciprocal or inter-insurance exchange, partnership, syndicate, business trust, corporation and

9  entity.")  Defendants do not address how these interpretative guides should be applied to

10  construe the Policies.  Therefore, the Court finds that legislative goals and social policy both

11  support a broad construction of the term "person" to include both natural persons and business

12  entities.

13    An examination of the "transaction as a whole" is of limited assistance in construing the

14  Policies because the parties have not cited any evidence of their intent regarding the meaning

15  of "person."  The City, however, argues that the Court should consider the drafting intent

16  associated with the standard industry form language that was employed in the Policies.

17  (Doc. 48 at 9-10.)  The City argues again that this intent can be determined from *The FC&S*

18  *Bulletin*, which explains that the phrase "that a person occupies" was added to the private

19  occupancy provision to restrict coverage to situations in which a claimant already had a legal

20  right to occupancy, not just a claim of a future right of occupancy:

21          the phrase [right of private occupancy] as it appears in the current
           CGL forms in reality restricts coverage to situations wherein a
22          claimant has a legal right to occupancy already possessed and the
           alleged tortfeasor who invades that right, who commits the offense,
23          is the property's owner, landlord, or lessor. Consider that the
           current CGL forms take "invasion of the right of private
24          occupancy" (the phrase as it appears in the broad form
           endorsement) and add "of a room, dwelling, or premises that a
25          person occupies by or on behalf of its owner, landlord or lessor."
           Clearly, the phrase deals with dwellings or premises already
26          occupied by a person as opposed to some generalized theory of a
           right to seek and obtain a right to occupancy.

27

28                                    - 22 -

(Doc. 48, Ex. A.)  The *FC&S Bulletin* then cites a case in which a court interpreted the right of private occupancy to include claims brought by prospective tenants who alleged they were denied occupancy of the insured's apartment because of racial discrimination. (*Id.*) Defendants do not address this argument or provide any other explanation of the intent of the wording of the Private Occupancy Provision.  Therefore, the Court finds that an examination of the transaction as a whole does not support Defendants' argument that the word "person" refers only to natural persons.

Finally, the Policies do not specifically exclude personal injury coverage for a lawsuit brought by a business entity as opposed to a natural person.  Therefore, the Court will not construe the Policies to include this limitation.  Defendant National Union has specifically used the term "natural person" in other insurance policies to limit coverage to human beings.  *See Cal. Union Ins. Co. v. Am. Diversified Savs. Bank*, 948 F.2d 556, 566 (9th Cir. 1991) (quoting National Union policy defining employee to include "any natural person"); *AT&T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409, 417 n.14 (Del. 2007) (National Union policy defining "Natural Person Insured").  Defendants could have utilized this language or another explicit exclusion in the Policies at issue if they intended to limit coverage to natural persons.  *See Nucor*, 2012 WL 5893485, at *8 (stating that if an insurer intends a narrow definition of a term, it must define that term within its policies).  Defendants have not offered any evidence demonstrating they intended to limit private occupancy coverage to natural persons.  Giving the insurance Policies their plain and ordinary meaning, the Court finds that the term "person" is ambiguous and should be construed against Defendants, as the insurers, to refer to natural persons and business entities such as Valley Aviation.

Accordingly, the Valley Aviation litigation implicated coverage under the Private Occupancy Provision.  Having found coverage under the Private Occupancy Provision, the Court need not determine whether the Policies also provided coverage for the Valley Aviation litigation under the discrimination provision.

1   **IV.  Whether Valley Aviation Alleged a Claim During the Policy Periods**

2          The parties also dispute whether the Valley Aviation litigation alleged a personal injury

3   during the policy periods.  The Policies provide coverage for personal injury offenses occurring

4   during the policy period January 26, 2008 to January 26, 2009 for the National Union Policy

5   and January 26, 2009 to January 26, 2010 for the Commerce and Industry Policy.  (Doc. 25,

6   Ex. 1 at 5, Doc. 25, Ex. 2 at 6) (stating that the insurance applies to personal injury caused by

7   an offense arising out of your aviation operations "but only if the offense was committed . . .

8   during the policy period").

9          Defendants argue that the City failed to produce any evidence that the alleged personal

10  injury offenses occurred during either policy period.  Defendants argue the Valley Aviation

11  litigation was based on a lease that began in the "early 1990s" and that Valley Aviation alleged

12  it had "endured numerous and repeated acts of discrimination since the acquisition of the land

13  lease," which was long before either policy took effect.

14         Courts have held that the date of an alleged offense under a personal injury policy

15  triggers coverage and the duty to defend.  *See Valley Imp. Assn., Inc. v. U.S. Fid. & Guar.*

16  *Corp.*, 129 F.3d 1108, 1118 (10th Cir. 1997) (landowners' pleadings state a claim potentially

17  within the "invasion of the right of private occupancy coverage" even though, "as the facts

18  turned out no foreclosures, wrongful or otherwise occurred during the policy period").  Here,

19  Valley Aviation alleged ongoing misconduct from "the early 1990s" onward, including during

20  the policy periods.  The original and amended complaints alleged that a representative of the

21  City sent a threatening letter to Valley Aviation on January 14, 2009, during the National Union

22  policy period, "in furtherance of the long-standing policy and pattern of discrimination against

23  Valley Aviation."  (Doc. 25 ¶ 3, Ex. 3, Doc. 25 ¶ 20, Ex. 8.) *See W. Cas. & Sur. Co. v. Int'l Spas*

24  *of Az., Inc.*, 634 P.2d at 3, 6 (Ariz. Ct. App. 1981) (stating that, under Arizona law, "if any claim

25  alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the

26  entire suit, because it is impossible to determine the basis upon which the plaintiff will recover

27  (if any) until the action is completed.").

28                                                  - 24 -

Additionally, the original complaint alleged an "ongoing scheme" of misconduct and was dated April 27, 2009, during the Commerce and Industry policy period. (Doc. 25, Ex. 3.) The amended complaint, dated November 13, 2009, also alleged an "ongoing scheme" of misconduct, indicating that the alleged offenses occurred during the Commerce and Industry policy period. (Doc. 25, Ex. 8.) These allegations were sufficient to establish a claim during the policy periods.

The deposition and trial testimony in the Valley Aviation litigation also established that Valley Aviation sought damages for offenses occurring during the policy periods. At trial, Valley Aviation's expert witness on accounting issues testified that Valley Aviation suffered damages "on account of discrimination" totaling $7,820,000.00 from November 1, 2008 through summer 2010. (Doc. 62, Ex. A at 80.) The deposition and trial testimony of Clare Pryke, a part owner of Valley Aviation and the on-site manager at Glendale Airport, also addressed alleged discriminatory conduct that took place during her employment beginning in March 2008 (during the National Union policy period) and throughout 2009 (during the Commerce and Industry policy period). (Doc. 47 ¶¶ 1-12, Exs. 1 and 2.) Pryke's trial and deposition testimony also referred to the City's January 14, 2009 letter, which was an alleged act of discrimination during the National Union policy period. (*Id.*)

The Court may consider this evidence to determine whether the Valley Aviation litigation alleged events that fell within the policy periods. *See Lennar*, 151 P.3d at 548 (considering affidavit of expert to determine whether property damage occurred during the policy period). Accordingly, the Court finds that the Valley Aviation litigation alleged claims of offenses occurring during the policy periods and thus triggered coverage.

**V.   The City's Delay in Providing Notice of the Amended Complaint**

Defendants argue that the original complaint is the sole source of their coverage obligation, if any, because the City did not provide timely notice of Valley Aviation's amended complaint. (Doc. 24 at 10 n.2.) Defendants argue that because the City did not tender the amended complaint until over a year after it was filed and served on the City in the Valley

1   Aviation litigation, the amended complaint could not trigger coverage when none had

2   previously existed. Defendants also contend that the allegations in Valley Aviation's amended

3   complaint are essentially the same as those in the original complaint and therefore, even if it had

4   been tendered in a timely manner, it did not alter the coverage determination. (*Id*.)

5       Under Arizona law, an insurer is relieved of its coverage obligations if it has been

6   substantially prejudiced by the insurer's breach of insurance policy conditions relating to timely

7   notice. *See Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guar. Fund*, 943 P.2d 793

8   (Ariz. Ct. App. 1997) (noting that an insured's breach of a cooperation provision relieves an

9   insured of liability, if the insurer was substantially prejudiced by the breach). The parties do

10  not address whether the City's delay of over twelve months in tendering the amended complaint

11  was a breach of the Policies' notice provisions. However, the Court need not resolve that issue

12  because Defendants waived any late notice defense when they denied coverage in 2011 based

13  on their interpretation of the Policies and did not assert any breach of the Policies' notice

14  requirements. (Doc. 25, Exs. 6 and 9.) *See U.S. Fid. & Guar. Co. v. Powercraft Homes, Inc*.,

15  685 P.2d 136, 139 (Ariz. Ct. App. 1984) (finding that "having once denied coverage on the

16  basis that a claim is not covered by the policy, the insurer cannot thereafter raise the new

17  defense of the insured's failure to comply subsequently with the policy's notice provisions").

18      Additionally, Defendants have not shown that there is a material issue of fact as to

19  whether the City's delay in providing notice of the amended complaint resulted in prejudice.

20  The insurer bears the burden of proving prejudice under Arizona law. *Liberty Mut. Fire Ins.*

21  *Co. v. Mandile*, 963 P.2d 295, 302 (Ariz. Ct. App. 1997) (insurer bears burden of establishing

22  prejudice). Delay in providing notice alone is not sufficient to establish prejudice. *Globe*

23  *Indem. Co. v. Blomfield*, 562 P.2d 1372, 1374 (Ariz. Ct. App. 1977) (finding that insurer did not

24  adequately demonstrate disputed facts regarding prejudice based on insured's six-month delay

25  in providing notice of the incident). Defendants argue that they were prejudiced by the late

26  notice of the amended complaint because they were deprived of the opportunity to control the

27  defense of the Valley Aviation litigation. (Doc. 55 at 17.) Defendants, however, have not

28

- 26 -

provided any evidence that their involvement in the defense would have altered the result of the Valley Aviation litigation. *See Ins. Co. of the State of Pa. v. Assoc. Int'l Ins. Co.*, 922 F.2d 516, 524-25 (9th Cir. 1990) (affirming summary judgment because prejudice could not be established merely because the insurer was denied the ability to contemporaneously investigate the claim and the opportunity to settle the case early); *Lindus v. N. Ins. Co.*, 438 P.2d 311, 315 (Ariz. 1968) (holding that the insured's failure to give the timely notice of the loss required by the policy did not defeat the claim because the insurer failed to show that it was prejudiced by the insured's delay).

Furthermore, Defendants argue that the amended complaint could not trigger additional coverage under the Policies because the allegations in the amended complaint were essentially the same as the allegations in the original complaint (Doc. 24 at 10 n. 2). Therefore, Defendants were not prejudiced by the City's tender of the amended complaint in 2011, rather than in 2010, because Defendants were aware of the Valley Aviation litigation and had already denied coverage. Furthermore, Defendants do not argue that they would have acted differently had the amended complaint been tendered sooner than 2011. Defendants have not demonstrated the existence of disputed facts regarding prejudice.

Accordingly, the Court finds that the City's delay in tendering the amended complaint did not relieve Defendants of their coverage obligations and that their coverage liability is not limited to the original complaint.

## VI.   Whether the Valley Aviation Litigation Alleged Damages

The Policies provide that Defendants will "pay those sums that the insured becomes legally obligated to pay as damages because of personal injury . . . to which this insurance applies." (Doc. 25, Exs. 1 and 2.) There is no dispute that the amended complaint specifically sought damages. The parties, however, dispute whether the original complaint sought damages. Although the Court finds that Defendants' coverage liability is not limited to the original complaint, the Court will consider whether the original complaint sought damages.

The City contends that the original complaint, filed April 27, 2009, sought attorneys' fees and costs, which constitute damages. The City further argues that Valley Aviation's notice of claim, dated May 1, 2009 and served on Defendants with the original complaint, sought monetary damages. Defendants argue that because the original complaint in the Valley Aviation suit sought declaratory relief, not damages, it did not trigger coverage under the Policies. (Doc. 55 at 12.) Defendants further argue that Valley Aviation's request for attorney's fees and costs does not change this conclusion.

The Court finds that Valley Aviation's notice of claim dated May 1, 2009, which was tendered to Defendants along with the original complaint in the Valley Aviation litigation, establishes that Valley Aviation sought damages in connection with the complaint. The notice of claim specifically refers to the complaint. (Doc. 47 ¶ 13, 30-32; Doc. 25, Ex. 4.) The Ninth Circuit has held that the allegations of a complaint, considered along with a follow-up letter containing additional information about the dispute, were collectively sufficient to trigger an insurer's duty to defend under Arizona law. *Tri-Star Theme Builders, Inc. v. OneBeacon Ins. Co.*, 426 Fed. Appx. 506, 514 (9th Cir. 2011) (when considered together, the complaint and the attached letter were sufficient to trigger commercial general liability insurer's duty to defend). Accordingly, the Court need not determine whether Valley Aviation's request for attorneys' fees and costs was sufficient to allege damages.

## VII. Bad Faith

The City also alleges a tortious breach of the implied covenant of good faith and fair dealing based on Defendants' allegedly unreasonable handling of the City's claim for coverage in connection with the Valley Aviation litigation. (*Id.*) A duty of good faith and fair dealing is imputed into every insurance contract. *Acosta v. Phoenix Indem. Ins. Co.*, 153 P.3d 401, 404 (Ariz. Ct. App. 2007). To establish a breach of the duty of good faith and fair dealing, and thus prevail on a bad faith claim, a plaintiff must show: (1) that the insurer denied benefits under the policy without a reasonable basis, and (2) that the insurer knowingly or recklessly disregarded the lack of a reasonable basis for denying the benefits. *Trus Joist Corp. v. Safeco Ins. Co.*, 735

P.2d 125, 134 (Ariz. Ct. App. 1987). "Whether the insurer ultimately losses its dispute with the insured is not important to the resolution of the bad faith issue. Even if ultimately wrong, if a reasonable basis existed for denying the claim, the insurer cannot be liable in bad faith." *Aetna Cas. and Sur. Co. v. Maricopa Cnty. Superior Court*, 778 P.2d 1333, 1336 (Ariz. Ct. App. 1989); *see also Manterola v. Farmers Ins. Exch.*, 30 P.3d 639, 645 (Ariz. Ct. App. 2002) (an insurer "may be 'found liable for bad faith despite the fact that, under the circumstances, the policy did not require it to either defend or indemnify' the insured.") (quoting *Lloyd v. State Farm Mut. Auto Ins. Co.*, 943 P.2d 729, 737 (Ariz. Ct. App. 1996)).

Defendants argue that because there is no coverage under the Policies, they cannot be held liable for bad faith as a matter of law. (Doc. 24 at 16.) "[A] bad faith claim based solely on a carrier's denial of coverage will fail on the merits if a final determination of non-coverage is ultimately made." *Manterola*, 30 P.3d at 646. As discussed above, the Court finds that the Valley Aviation litigation triggered coverage under the Private Occupancy Provision of the Policies. Therefore, Defendants' argument fails.

Moreover, an insurer's contention that its coverage decision was based on a reasonable interpretation of the law does not automatically dispose of a bad faith claim. *Rowland v. Great States Ins. Co.*, 20 P.3d 1158, 1164 (Ariz. Ct. App. 2001) ("An insurer is not immune from bad faith liability merely because its acts or omissions were based on what it contends was a reasonable, and previously unresolved construction of a statute."). Although the insurer's belief that its legal position was reasonable may be a defense to a charge of bad faith, such a defense is usually a question of fact that cannot be decided in a summary judgment motion. *See Zilisch v. State Farm Mut. Auto Ins. Co.*, 995 P.2d 276, 281 (Ariz. 2000); *Sparks v. Republic Nat. Life Ins. Co.*, 647 P.2d 1127, 1137 (Ariz. 1982) (same).

In *Rowland*, the Arizona Court of Appeals rejected the insurer's contention it could not be liable in bad faith because prior Arizona decisions had not squarely addressed a legal issue pertaining to coverage. 20 P.3d at 1166-67. The court in *Rowland* concluded that there was an

- 29 -

1  issue of fact concerning whether the insurer disregarded authority favoring the insured's

2  position and improperly failed to investigate the validity of its own position.

3      In this case, there are issues of fact regarding whether there was a reasonable basis for

4  Defendants' denial of coverage under the Policies, and if not, whether Defendants knowingly

5  or recklessly disregarded the lack of a reasonable basis for denying the benefits. *See Trus Joist,*

6  735 P.2d at 134. Accordingly, the Court denies Defendants' motion for summary judgment on

7  the City's bad faith claim.[8]

8      For the reasons set forth above,

9      **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 24) is

10 **DENIED**.

11     **IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment

12 (Doc. 46) is **GRANTED** and the Court finds that Defendants had a duty to defend the City in

13 the Valley Aviation litigation and are liable for the City's reasonable defense costs.

14     DATED this 28th day of March, 2013.

15

16

17                   Bridget S. Bade

18               United States Magistrate Judge

19

20

21

22

23

24

25

26 _____

27    [8] Plaintiff's request pursuant to Rule 56(d) to delay ruling on Defendants' motion for summary judgment pending further discovery is denied as moot.

28                        - 30 -